UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Demetrius Devell Dobbins, Sr.,

Petitioner,

vs.                                     REPORT AND RECOMMENDATION

Terry Carlson, Warden,

Respondent.          Civ. No. 08-21 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, under Title 28 U.S.C. §2254.

The Petitioner Dobbins Demetrius Devell Dobbins, Sr. ("Dobbins"), appears <u>pro se</u>, and the Respondent appears by Marcy S. Crain, Assistant Anoka County Attorney.

For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be denied.

## II.  Facts and Procedural Background

Dobbins is a State prisoner, who is currently serving a life sentence, with a minimum of thirty (30) years before the possibility of parole, at the Minnesota Correctional Facility, in Rush City, Minnesota.  The sentence resulted from Dobbins' conviction, by a Jury, on November 5, 2004, in Anoka County District Court, on one Count of Premeditated Murder in the First Degree, in violation of Minnesota Statutes Section 609.185(a)(1), and Section 609.05.  See, State v. Dobbins, 725 N.W.2d 492, 500 (Minn. 2006), cert denied, --- U.S. ---, 127 S.Ct. 3021 (2007).  The facts which lead to Dobbins' conviction may be briefly summarized.

In the Summer of 2003, Dobbins and his girlfriend went to downtown Minneapolis in order to sell marijuana.  Id. at 498.  While downtown, they met Quintin Roderick Lavender ("Lavender").  Id.  Dobbins agreed to let Lavender sell nine bags of marijuana for ten dollars a piece, with Lavender keeping thirty (30) dollars from the sales.  Id.  Lavender made the sales, but he left before giving Dobbins the remaining sixty (60) dollars.  Id.  Approximately two weeks later, Dobbins saw Lavender, and Lavender agreed to meet Dobbins later that day to give him the sixty (60) dollars.  Id.  Dobbins did not attend that meeting, and did not see Lavender until December 5, 2003. Id.

On December 5, 2003, Dobbins, his girlfriend, her daughter, and Dobbins' cousin, Andre Coleman ("Coleman"), went to the City Center in downtown Minneapolis.  Id.  According to Myshohn King ("King"), he and Lavender met Dobbins at approximately 2:00 or 3:00 o'clock p.m.  Id.  When Dobbins saw Lavender, he began to argue with him over the sixty (60) dollars that Lavender owed him.  Id.  Dobbins told Lavender to take a bus back to Dobbins' house, in Columbia Heights, Minnesota, with the other members of the group.  Id.  Lavender agreed and, when they arrived at Dobbins' house, the following occurred:

> Coleman arrived wearing a jogging suit and a pair of white gloves.  Coleman and Dobbins went into a bedroom.  Shortly thereafter, Dobbins came out of the room and told his girlfriend and Andre to go downstairs and leave, which they did.  According to King, at the time of the shooting there were four people in the house: Dobbins, Lavender, Coleman, and King.
>
> Dobbins then returned to the bedroom.  After a few minutes, Coleman came out of the bedroom, stood by a wall, and loud music started to play.  King testified that both he and Lavender became nervous because they did not know what was going on.  After a couple of minutes, Dobbins, wearing the gloves Coleman had worn earlier, came out of the bedroom with a gun in his hand.  Dobbins then shot Lavender twice.  After the shooting, Coleman left the house and Dobbins moved Lavender's body and placed it in the bathtub.  Dobbins then told King to help clean up the blood and King complied.  King testified that he did not

> want to help Dobbins, but said that he was not going to
> "talk back" to Dobbins at that point. King cleaned up the
> blood in the living room while Dobbins mopped the floor
> in the bathroom. Dobbins put some of the used cleaning
> materials into a garbage bag.

Id.

About thirty (30) minutes after the shooting, a young woman entered the house, and

Dobbins stated that he had shot someone. Id. The woman grabbed some clothes and

quickly left the house. Id. Not long after the woman left, another woman entered the

home, but left after being scared upon seeing Lavender's body. Id.

After the women left, Dobbins and King wrapped Lavender's body in an air

mattress, and moved the body into a shed behind the house. Id. at 498-99. Dobbins

and King called a taxi, and took it to Coleman's house, where they put clothes from

the crime scene into Coleman's basement. Id. at 499. After depositing their clothes,

Dobbins and King walked to a convenience store, where Dobbins bought lighter fluid.

Id.

During Dobbins' attempt to clean up the murder scene, an emergency call was

placed, around 6:30 o'clock p.m., to the Minneapolis Emergency Communications

Unit. Id. at 497. The caller reported that a homicide had taken place at a house in

Columbia Heights. Id. As recounted by the Minnesota Supreme Court:

Police officers Gregory Sinn, Jason Beckett, and Lenny Austin responded to the call. Shortly after arriving on the scene, Austin obtained the telephone number from which the 911 call had been placed. Austin called this number and talked with the person who reported the homicide. This person then called back later and informed Austin that the two individuals involved in the homicide were returning to the scene of the homicide and described the two individuals to Austin. After finishing this second conversation, Austin saw two men matching the caller's descriptions walking toward the house. Austin told Sinn and Beckett that the suspects were returning to the house, and Sinn and Beckett arrested the two men when they entered the driveway. The men identified themselves as [Dobbins] and Myshohn King. At the time of arrest, Dobbins was carrying a small plastic convenience-store bag that contained a can of lighter fluid. Austin subsequently went to the backyard, where he entered a storage shed and found Quintin Lavender's body inside.

Id.

On that same evening, the Anoka County Sheriff's office conducted an investigation of the crime scene. Id.

In the driveway, the officers discovered "a plastic bag that contained a large can of lighter fluid and three smaller cans of cigarette-lighter-refill fluid." Id. When the officers searched the house, they found a "large bloodstain on the living room carpet, bloodstains in the shape of footprints on the hallway carpet, and a bloody mop leaning against a bathroom sink." Id. DNA tests, which were run on the blood from the shed

door, and from the living room floor, matched Lavender's DNA profile.  Id.  Officers

also found numerous large garbage bags in the kitchen, that contained blood soaked

clothes, rags, and a blood stained inflatable air mattress.  Id.  Blood found on

Dobbins' pants, shoes, and socks, also matched Lavender's DNA profile.  Id.

A Search Warrant was executed at Coleman's home.  Id.  In a lower-level

bedroom, the officers found a pair of blue jeans, which were stained with blood that

matched Lavender's DNA profile.  Id.  Swabbings taken from Dobbins' hands, and

clothing, revealed gunshot residue.  Id.

When he was arrested, King told police that he was in the area to meet his

girlfriend but, at Trial, he admitted that he had lied to the police.  Id. at 499.  In

exchange for his testimony, King entered a plea agreement and, on the stand, he

admitted that he could receive a seventy five (75) percent lesser sentence than

Dobbins.  Id.  However, King claimed that the reason he had agreed to testify was

because Dobbins killed Lavender over nothing, and that what had happened was

wrong.  Id.

Dobbins' girlfriend testified that, after they returned from the City Center, she

stayed at Dobbins' house but left before the shooting.  Id.  During her testimony, she

admitted that she had told police that she heard Dobbins on his cell phone tell Coleman to "Bring it." Id.

The sisters of Dobbins' girlfriend, Shiniqua and Thaijuana, also testified at his Trial. Id. Shiniqua stated that she and Thaijuana drove their children over to Dobbins' house in the afternoon. Id. Dobbins met Shiniqua in the driveway, and told her not to come into the house. Id. Dobbins said that he was cleaning up something that the children should not see. Id. Dobbins admitted to calling Coleman to bring a gun over, and that he shot Lavender because Lavender owed him money. Id. Shiniqua then testified that she did not leave when Dobbins stopped her in the driveway, but went inside the house. Id. As she related at Trial, inside the house she saw the following:

> King standing in the living room, a body in the hallway outside of the bathroom, and some blood on the living room floor and in the hallway. Shiniqua gathered up some of her clothes and other personal belongings and went outside to Thaijuana's car. Shiniqua then reentered the house with Thaijuana. This time, Shiniqua saw that the body had been wrapped in an air mattress. She also testified that Dobbins told her they were going to put the body into the shed in the back yard, and she later saw the body in the shed.

Id.

Thaijuana testified that she saw Dobbins, and King, carry Lavender's body out to the shed. Id.

When Thaijuana asked Dobbins how he had killed Lavender, Dobbins "told her that he turned up the volume of the music that was playing and then shot Lavender," and "Dobbins also told Thaijuana that Coleman brought over a gun and left with the gun soon after the shooting." Id. After she saw Lavender's body in the shed, Thaijuana went home, and told her father what had happened. Id. at 499-500. Thaijuana's father dialed 911, and Thaijuana reported the homicide. Id. at 500. In her testimony, Thaijuana admitted to previously telling police that she didn't know who was responsible, but she did not remember telling the 911 operator that she did not know who shot Lavender. Id. at 499.

On the stand, Dobbins denied killing Lavender. Id. at 500. In his testimony, Dobbins admitted that he brought Lavender over to his house in order to get Lavender a ride to the house of Lavender's cousin, where Lavender could get Dobbins' money. Id. At Dobbins' house, Dobbins called Coleman to see if he would give Lavender a ride. Id. Dobbins than handed the phone to Lavender so that Lavender could call his cousin. Id. As recounted by the Minnesota Supreme Court:

arrived Shortly thereafter, Coleman entered house and went into the bedroom where Dobbins was.  Dobbins said he was surprised to see that Coleman had gloves on.  Dobbins asked Coleman about the gloves and Coleman then lifted his shirt to reveal a gun.  Dobbins testified that he asked Coleman about the gun and told him "we don't need that." Coleman then left the bedroom and went to the living room.

> Dobbins testified that he stayed in his bedroom to iron some clothes and, while there, he heard a gunshot.  Dobbins said he ran out into the hallway where he saw King fire a second shot at Lavender, after which Lavender rolled over and fell onto the floor.  According to Dobbins, he asked Coleman "should we take 'em to the hospital?" Dobbins also thought that Lavender may have been faking, because at first he did not see any blood.  Coleman wrapped the gun in a pillowcase, and after that, Coleman got a blanket and rolled Lavender's body over.  Dobbins said he then saw a large pool of blood.  According to Dobbins, at that point he "pretty much knew [that Lavender had been shot]." Dobbins said that he then started to get nervous and was trying to get his belongings out of the house.

Id.

Dobbins claimed that he helped move Lavender's body out to the shed, because he did not want anyone to see it.  Id.

After Lavender's body was moved, Dobbins packed his belongings, and then he and King took a taxi over to Coleman's residence.  Id.  After they left their bags at Coleman's, Dobbins and King walked to a store, where Dobbins purchased lighter fluid to burn his clothes.  Id.  Dobbins stated that, once the lighter fluid was

purchased, he walked over to the house of his girlfriend's cousin, in order to tell her that he was coming to pick her up.  Id.  Dobbins denied making any statements to Shiniqua, and Thaijuana, about shooting Lavender.  Id.  He also acknowledged that King and Coleman did not know Lavender until the day of the murder.  Id.

As we have noted, Dobbins was convicted on one Count of Premeditated Murder in the First Degree, in violation of Minnesota Statutes Section 609.185(a)(1), and Section 609.05.  Id.  Following his conviction, Dobbins filed a direct appeal to the Minnesota Supreme Court.[1]  Id. at 500.  In that appeal, Dobbins argued that the District Court erred in allowing the only African-American venireperson to be struck from serving on the Jury, and had violated his Sixth Amendment right to effectively cross-examine a State's witness.  Id..  Dobbins also claimed that the District Court erred in not instructing the Jury that Dobbins' girlfriend could have been considered an accomplice,[2] and that the State's repeated prosecutorial misconduct prevented him from receiving a fair Trial.  Id.  Dobbins' final claim was that the failure of his

---

[1]Pursuant to Minnesota Statutes Section 632.14, a person who has been convicted of first degree murder may appeal directly to the Minnesota Supreme Court.

[2]Since Dobbins did not raise this issue in his pending Habeas Petition, we will not address it further.

attorney to object to the prosecutorial misconduct constituted an ineffective assistance of counsel. Id. at 500-01.

On December 28, 2006, the Minnesota Supreme Court affirmed Dobbins' conviction. The Court first considered whether the Trial Court had erred in allowing the only African-American venireperson to be struck from the Jury. The Court noted that, under the applicable law, the determination of the Trial Court is given great deference, and will only be reversed if there was clear error. Id., citing State v. White, 684 N.W.2d 500, 506-07 (Minn. 2004). "But a district court's legal determinations are questions of law that we review de novo." Id., citing State v. Wiernasz, 584 N.W.2d 1, 3 (Minn. 1998). The Court found that there was a prima facie showing of discrimination, but that the State had found a race neutral explanation for that strike. Id. at 501-03. Furthermore, the Court determined that Dobbins had failed to carry his burden of proving purposeful discrimination, after the State had offered it's race neutral reason. Id. at 503-504. As a result, the Court concluded that the Trial Court's decision to strike was not clearly erroneous. Id.

Next, the Court addressed Dobbins' claim that his Sixth Amendment right to confrontation was violated, when he was not allowed to question King about how many months King's sentence would be reduced for testifying. Id. at 505. The Court

relied upon its holding in <u>State v. Greenleaf</u>, 591 N.W.2d 488 (Minn. 1999),[3] in concluding that the Trial Court had not erred in limiting Dobbins' cross examination. <u>Id.</u> The Court noted that, although Dobbins was not allowed to question King on the number of months that King's sentence could be reduced, Dobbins still could question King on the percentage of time that his sentence could be reduced.  <u>Id.</u>

The Court also rejected Dobbins' final argument, that the individual and cumulative effective of repeated prosecutorial misconduct, had deprived him of a fair Trial.  <u>Id.</u> at 506.  The Court analyzed each alleged incident of misconduct, both individually and cumulatively, in order to determine whether Dobbins was deprived of a fair Trial.  <u>Id.</u> at 506-13.  Dobbins had objected to questions regarding his ability to tailor his testimony, since he had been present during the testimony of the other witnesses. <u>Id.</u> at 506-07. The Court had to determine whether that alleged misconduct was harmless beyond a reasonable doubt.  <u>Id.</u> at 507.  The Court could not grant

---

[3]In <u>State v. Greenleaf</u>, 591 N.W.2d 488, 502 (Minn. 1999), the Minnesota Supreme Court feared that inquiring into the number of months that a testifying witness could serve might "mislead the jury regarding the number of months another defendant, if convicted, might be confined," and that "[i]t is for the court to sentence, and not the jury, and thus the court, by allowing the jury to only know [the percentage of time by which the sentence was reduced], properly prevented the jury from speculating about possible sentences."

Dobbins a new Trial if the guilty Verdict was surely unattributable to that asserted misconduct. Id., citing State v. Hunt, 615 N.W.2d 294, 302 (Minn. 2000). The Court determined that the guilty Verdict was surely unattributable to that misconduct, because Dobbins' objection minimized its effect, Dobbins denied tailoring his testimony, and the evidence overwhelmingly showed that Dobbins had shot Lavender. Id. at 508. Accordingly, the Court concluded that the State's misconduct was harmless beyond a reasonable doubt. Id.

The Court also analyzed Dobbins' claims of alleged prosecutorial misconduct, which were not the subject of an objection at Trial. Id. at 506. The Court examined that asserted misconduct under the plain error doctrine. Id. Plain error consists of "(1) error, (2) that is plain, and (3) affects substantial rights." Id. at 508, citing State v. Leake, 699 N.W.2d 312, 327 (Minn. 2005). Recently, under the third prong, it has been held that the State bears the burden of persuasion in showing that "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." Id., citing State v. Ramey, 721 N.W.2d 294, 302 (Minn. 2006), quoting State v. MacLennan, 702 N.W.2d 219, 236 (Minn. 2005). If the three (3) prongs of the plain error test are satisfied, the Court will "then

- 13 -

[assess] whether [the Court] should address the error to ensure fairness and the integrity of the judicial proceedings." Id., quoting State v. Ramey, supra at 302.

The Court first analyzed the prosecution's cross examination that touched upon Dobbins' constitutional right to counsel, and his right to silence, which, as noted, had not been the subject of an objection at Trial. Id. at 508-09. The Court found that line of questioning to constitute prosecutorial misconduct, but noted that the questioning was limited to seven (7) questions, and ended after the Judge asked the parties to approach the bench. Id. at 510.

The second unobjected-to conduct involved a series of "Are they lying?" type questions. Id. at 511. The Court held that type of questioning was inappropriate because it "shifts the jury's focus by creating the impression that the jury must conclude the relevant witnesses were lying in order to acquit a defendant." Id., citing State v. Morton, 701 N.W.2d 225, 235 (Minn. 2005). The Court found that those questions were prosecutorial misconduct because Dobbins had not called the witnesses' credibility into question.[4] Id. 511-12.

---

[4]The Court noted that the "Are they lying?" questions were appropriate as to King, because Dobbins disputed King's testimony, and claimed that King had shot Lavender. Id. at 511. As a result, Dobbins had placed King's credibility into central focus and the "Are they lying?" questions were then appropriate. Id. However, the

The third unobjected-to conduct arose from the prosecution's questions which diverted the Jury's attention from the issues of guilt and innocence. Id. at 512. The State asked Dobbins whether he was the father of his girlfriend's child, questioned his faithfulness to his girlfriend, and framed questions around "in your world" references. Id. The prosecutor also made comments in his closing argument which told the Jury what he would do if he were Dobbins.[5] Id. The Court observed that the State should not interject, into the Trial, issues that are broader than the defendant's innocence or guilt. Id. In the case of the "in your world" questions, the Court explained that those do not constitute misconduct if the comments were being employed to prepare the Jury for evidence of the unfamiliar drug world. Id. However, the Court determined that the line of questioning, or comments, would be impermissible if they highlighted a defendant's racial or socioeconomic background. Id. The State made no effort to clarify its remarks, even after Dobbins stated that he lived in the same world as the prosecutor. Id. Since the comments were not clarified, the Court concluded that the

_____

same line of questioning as to Dobbins' girlfriend, and her sisters, Thaijuana, and Shiniqua, was misconduct. Id. at 511-12.

[5]For example, in his closing argument, the prosecutor stated, "I would know the difference and I would be honest when I testify," as "[d]esperation and self-preservation can lead to some pretty fanciful tales." Id. at 512.

State had committed misconduct.  Id.  The Court did not need to analyze whether the remarks, which were made in the State's closing argument, were improper, since the State conceded the point.  Id.

Then the Court turned to determine whether the State's misconduct, whether considered individually, and cumulatively, entitled Dobbins to relief under the plain error doctrine.  Id. at 513.  While acknowledging that prosecutorial misconduct constitutes error, id., the Court concluded that the State had carried its burden in showing that the statements, both individually and cumulatively, were not prejudicial. Id. The Court reasoned that the strong evidence against Dobbins, as well as the State's showing that the misconduct was nonprejudicial, demonstrated that the misconduct did not "have a significant effect on the jury's verdict."  Id.

Further, the Court determined that Dobbins' claim of ineffective assistance of counsel was also without merit.  Id. As related by the Court, since the prosecutorial misconduct did not affect the outcome of the Trial, Dobbins was not prejudiced by his counsel's failure to object to the conduct in question.  Id.

On May 7, 2007, following the Minnesota Supreme Court's ruling, Dobbins filed a Petition for Writ of Certiorari with the United States Supreme Court.  See,

Answer to Petition for Writ of Habeas Corpus ("Answer"), Docket No. 12, Exhibit 10 at 16.  The Petition was denied on June 25, 2007.  See, Dobbins v. Minnesota, --- U.S. ---, 127 S.Ct. 3021 (2007).

On January 3, 2008, Dobbins filed his Petition for Federal Habeas Corpus in this Court seeking relief under Section 2254.  The Petition raises three (3) grounds for relief: 1) that Dobbins' right to Equal Protection  was violated when the Trial Court allowed the only African American to be struck from the jury; 2) that Dobbins' Sixth Amendment right of confrontation was violated by the Trial Court, when his questioning of any sentence reductions, which were secured by a cooperating witness, were limited; and 3) that Dobbins' right to a fair Trial, and to Due Process of Law, were violated by the individual and cumulative instances of prosecutorial misconduct.[6] See, Petition, Docket No. 1.

_____

[6]In his Reply Brief, see, Docket No. 15, at 29-31, Dobbins first states a claim, based upon an alleged ineffective assistance of counsel, which was not contained in his Petition for a Writ of Habeas Corpus, see Docket No. 1, or in his Memorandum in Support of Habeas Corpus, which elaborated upon his claims.  See, Docket No. 2. More egregiously, the claim was not before the Minnesota Supreme Court on direct review and, according to his Petition, the Petitioner has not sought Post-Conviction Relief before the State Courts.  The Petitioner makes no showing that he has properly exhausted that claim before the Minnesota State Courts, and therefore, we do not address the claim further.

III. <u>Discussion</u>

A.      <u>Standard of Review</u>.  "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  <u>Title 28 U.S.C. §2254(a)</u>.  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  <u>Estelle v. McGuire</u>, 502 U.S. 62,68 (1991).  As a result, before a Writ may issue, a petitioner must establish that the State's exercise of custody over his person is an affront to the Constitution, a Federal law, or a Federal treaty.  <u>Id.</u>; see also, <u>Lupien v. Clarke</u>, 403 F.3d 615, 619 (8th Cir. 2005); <u>Newton v. Kemna</u>, 354 F.3d 776, 782 (8th Cir. 2004), cert. denied, 543 U.S. 979 (2004); <u>Robinson v. Leapley</u>, 26 F.3d 826, 829 (8th Cir. 1994).

In 1996, Congress restricted the scope of a Federal Court's review of Habeas Petitions where, as here, the underlying claims were adjudicated in State Court.  See, <u>Antiterrorism and Effective Death Penalty Act of 1996</u>, Pub. L. No. 104-132, 110 Stat. 1214 (1996)("AEDPA"); see also, <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003) ("AEDPA circumscribes a federal habeas court's review of a state court decision.").  A Federal Court's authority to vitiate State Court decisions, by the granting of a Writ

of Habeas Corpus, is now limited to the narrow class of claims which have been fully

exhausted in the State Courts, and which involve an adjudication that either:

> (1)    resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)    resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State Court proceeding.

Title 28 U.S.C. §2254(d).

The Supreme Court has determined that the "contrary to," and "unreasonable

application" clauses of Section 2254(d)(1), present two (2) separate grounds on which

a Federal Court may grant Habeas relief to claims adjudicated in the State Courts. See,

Williams v. Taylor, 529 U.S. 362 (2000).

The Court has explained, as follows:

> Under the "contrary to" clause, a federal habeas court may
> grant the writ if the state court arrive[d] at a conclusion
> opposite to that reached by [the Supreme Court] on a
> question of law or if the state court decide[d] a case
> differently than [the Supreme Court] has on a set of
> materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifie[d] the correct governing
> legal principle from [the Supreme Court's] decisions but

> unreasonably applie[d] that principle to the facts of the
> prisoner's case.

Id. at 412-13.

The Court further explained that a consideration of a State Court's decision, under the

"unreasonable application" clause, requires a Federal Court to "ask whether the state

court's application of clearly established federal law was objectively unreasonable."

Id. at 409; see also, Underdahl v. Carlson, 462 F.3d 796, 798 (8th Cir. 2006); Davis v.

Norris, 423 F.3d 868, 874-75 (8th Cir. 2005); LaFrank v. Rowley, 340 F.3d 685, 689

(8th Cir. 2003), cert. denied, 541 U.S. 950 (2004).

Under this heightened standard of review, a Federal Court "may not issue the

writ simply because that court concludes in its independent judgment that the relevant

state court decision applied clearly established federal law erroneously or incorrectly,"

but "[r]ather, that application must also be unreasonable." Id. at 411; see also, Davis

v. Norris, supra at 875; Siers v. Weber, 259 F.3d 969, 972-73 (8th Cir.

2001)(examining the impact of Williams on Habeas proceedings), cert. denied, 534

U.S. 1138 (2002); Newman v. Hopkins, 247 F.3d 848, 850-51 (8th Cir. 2001), cert.

denied, 536 U.S. 915 (2002); Copeland v. Washington, 232 F.3d 969, 973 (8th Cir.

2000), cert. denied, 532 U.S. 1024 (2001).

As a consequence, <u>Williams</u> affirmed the distinction, which had previously been drawn by several Circuit Courts, that the "contrary to" clause was to be used in cases addressing pure questions of law and mixed questions of law and fact, whereas the "unreasonable application" clause addressed factual determinations.  See, e.g., <u>Evans v. Rogerson</u>, 223 F.3d 869, 872 (8th Cir. 2000)(the "in custody" determination for <u>Miranda</u> purposes is a question of law subject to the first prong of Section 2254(d), when the relevant facts are undisputed).  Therefore, when a petitioner argues that the State Court improperly applied clearly established Supreme Court law to a particular set of facts, the Federal Courts may not grant a Writ absent a finding that such an application was unreasonable.  "'[O]bjectively unreasonable' does not mean 'clear error,' because '[t]hese two standards * * * are not the same,'" and "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>LaFrank v. Rowley</u>, supra at 689, quoting <u>Lockyer v. Andrade</u>, supra at 75.

Additionally, Section 2254(e)(1) retains a presumption of correctness for all purely factual determinations rendered by a State Tribunal, which can, as a result, only be rebutted by the production of clear and convincing evidence to the contrary.  See, <u>Guinn v. Kemna</u>, 489 F.3d 357, 359 (8th Cir. 2007); <u>Lupien v. Clarke</u>, supra at 618;

Green v. Norris, 394 F.3d 1027, 1029 (8th Cir. 2005).   Despite this presumption,

Section 2254(d)(2) authorizes the issuance of a Writ if the State Court Judgment

"resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." Kinder v. Bowersox,

272 F.3d 532, 538 (8th Cir. 2001); McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir.

1996)("[W]e presume state court findings of fact to be correct in habeas proceedings

unless the petitioner establishes, the respondent admits, or the record shows

otherwise."), cert. denied, 521 U.S. 1127 (1997).   Thus, "[f]actual findings by the state

court 'shall be presumed to be correct,' a presumption that will be rebutted only 'by

clear and convincing evidence.'" Kinder v. Bowersox, supra at 538, citing Title 28

U.S.C. §2254(e)(1).

    B.    Legal Analysis.   As noted, Dobbins seeks Habeas relief on three (3)

separate grounds, and the Respondent opposes his Petition on its merits.   Since the

grounds for Habeas relief involve separate and different considerations, we address

them individually.

        1.    The Equal Protection Claim.

- 22 -

a.  <u>Standard of Review.</u>  "[R]acial discrimination in jury selection offends the Equal Protection Clause" of the Fourteenth Amendment. <u>Batson v. Kentucky</u>, 476 U.S. 79, 85 (1986), citing <u>Strauder v. West Virginia</u>, 100 U.S. 303 (1880).  While a Defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria[,]" <u>id.</u> at 85-86 (citations omitted), the "defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.'" <u>Id.</u> at 85, quoting <u>Strauder v. West Virginia</u>, supra at 305.  Instead, "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race." <u>Id.</u> at 86, citing <u>Strauder v. West Virginia</u>, supra at 305.

"A defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." <u>Id.</u> at 96.  To make a prima facie case, the defendant must show that he or she belongs to cognizable racial group, and "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." <u>Id.</u>, citing <u>Castaneda v. Partida</u>, 430 U.S. 482, 494 (1977).  The defendant must also "show that these facts and any other relevant

circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id.

After the defendant has made a prima facie showing, the burden shifts to the State to produce a race neutral reason for challenging that juror. Id. A race neutral reason means an explanation that is based upon something other than the person's race. See, Hernandez v. New York, 500 U.S. 352, 360 (1991). During the second step of the analysis, the State's reason need not be either persuasive or even plausible. See, Purkett v. Elem, 514 U.S. 765, 768 (1995). As long as the State's explanation displays nondiscriminatory intent, the reason offered will be considered race neutral. Id.

At the third step, the Trial Court must decide whether the defendant has proved purposeful discrimination. See, Purkett v. Elem, supra at 768 ("It is not until the third step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."); Batson v. Kentucky, supra at 98 ("The trial court will then have the duty to determine if the defendant has established purposeful discrimination"). At this stage, the ultimate burden of persuasion remains with the opponent of the strike. See, Purkett v. Elem, supra at 768, citing St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 511 (1993); see also, United States v. Bolden, --- F.3d ---, 2008 WL 4777202 at * 2 (8th Cir., November 4, 2008).

In deciding if there is discrimination, a Court may find that the State's implausible or fantastic reasons for striking were simply a pretext for discrimination. See, Purkett v. Elem, supra at 768. However, allowing a Court to disbelieve the State's implausible reason is quite different from "saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious." Id. When determining if the State's race-neutral reason is pretextual, the Court may have to look beyond the case at hand. See, Miller-el v. Dretke, 545 U.S. 231, 240 (2005)("Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand."). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at the third step." Id. (citation omitted). Evidence that the State asked different voir dire questions of minority and nonminority venirepersons can also be probative evidence of the State's discriminatory intent. Id. at 256-66.

b.   <u>Legal Analysis</u>.   Dobbins claims that the Minnesota Supreme Court unreasonably applied Federal law when it scrutinized the State's race neutral reason in striking a black venireperson, and when the Court failed to look beyond the four corners of the case when conducting a meaningful examination of the inquiry put to minority and nonminority venirepersons.   See, <u>Memorandum in Support of Petition ("Memorandum in Support")</u>, <u>Docket No. 2</u> at 6; <u>Petitioner Reply Memorandum ("Reply")</u>, <u>Docket No. 15</u>, at 5. We find both arguments to be without merit.

The State laid out the following five (5) race-neutral  reasons for striking venireperson No. 181 ("No. 181").

1.   She has clear sympathies for people who have been involved in the criminal justice system;

2.   She speculated and guessed about why people were involved in the criminal justice system;

3.   She expected leniency for her sister, felt the officer overreacted, and her sister attributed it to race;

4.   She and her family did volunteer work with inmates, offering them encouragement; and

>    5.    She felt that people were wrongfully charged, and
>           that juries had a role in wrongful convictions.

See, <u>Answer</u>, <u>Docket No. 12</u>, at 9-10, citing Voir Dire at pp. 144-47.

While Dobbins claims that No. 181's responses were manipulated in order to manufacture those reasons, we find that the reasons, which were contemporaneously provided by the State, were logically gleaned from No. 181's answers, and that the Court did not unreasonably apply Federal law in finding the State's explanation to be racially neutral.

The first race neutral reason is justified because No. 181 stated that there were innocent people in prison, she had a cousin with a drug problem who possibly had been convicted of a crime, and she expressed sympathy for both the accused, and the victim. See, <u>Answer</u>, supra Exhibit 1 at 123-26, 131. As for the second reason, No. 181 stated that people were possibly involved in the criminal justice system because of drugs, hanging out with the wrong crowds, or "they were at the wrong place at the wrong time and happened to get caught." <u>Id.</u> at 121. The State's third reason is not as convincing as the others cited, but it is possible to infer that No. 181's responses to questions about her  sister's ticket revealed a feeling that her sister was treated unfairly. <u>Id.</u> at 106 ("She felt as though she was treated a little unjustly."); at 107

("For some reason I guess he just decided that she needed to get the ticket."); at 128

("I know my sister," and "I know she's a very honest person, so I know that she

wouldn't do something deliberately," "[b]ut I don't know the officer * * * I don't

know what was going through his mind as well," and "Maybe he was just having a

bad day * * *.").

The fourth reason, that was advanced by the State, is also supported by No.

181's responses.  She had accompanied her parents to help counsel inmates, and that

experience had shaped her view that inmates may be in prison for reasons beyond the

crime that they committed.  Id. at 121-23.  As for the fifth and final reason, we find

support for that explanation near the end of the State's questioning of No. 181.

Although she acknowledged that people are accused of things because they really

have done something wrong, she stated that "other times I think that they are accused

because it's just maybe the way that the jury is swayed."  Id. at 126.  No. 181 also

noted that, through the media, "sometimes you wonder if that person was justly -- if

justice was served or if it wasn't."  Id. at 127.

Based on this Record, the Anoka County District Court, and the Minnesota

Supreme Court, did not unreasonable apply the law in concluding that the State's

reasons for striking No. 181 were race-neutral. As explained by the Minnesota

Supreme Court, the State's race-neutral reasons were not implausible or fantastic. See, State v. Dobbins, supra at 504, citing Purkett v. Elem, supra at 768. All the reasons listed were based upon the State's concern that No. 181 might be sympathetic to Dobbins.  As related by the Trial Court, "[the state's] concern with this particular potential juror was that she had expressed opinions leading the prosecutor to believe that she had sympathies to those that are accused of crimes or convicted of crimes specifically based on some of her responses relating to inmates, the situation with her sister."   Answer, supra Exhibit 1 at 153-54.   Indeed, the possibility that the venireperson might sympathize with the Defendant has been recognized as a race-neutral reason for striking that venireperson.  See, Williams v. Goose, 77 F.3d 259, 261-62 (8th Cir. 1996)(nephew of venireman, who was arrested for assault, and was found not guilty after Trial, might cause that venireperson to sympathize with the defendant, and therefore, was a valid race-neutral reason to strike that venireperson); United States v. Ali, 63 F.3d  710, 713 (8th Cir. 1995)(belief that father had been wrongfully accused could place sympathies with defendant, and was a valid race-neutral reason to strike).

Furthermore, the Trial Court looked at the questions that had been asked by the State, and found that there was no discriminatory intent but, rather, they were an

attempt to learn "the prospective juror's views, her philosophies if you will, and her views on the system and how it works." <u>Answer</u>, supra Exhibit 1 at 154. Finally, the Court found no pattern in the State's questioning to reveal a discriminatory intent. Here the Court found that the State was willing to exclude racist views by the pattern of challenges, that had been made, based upon the Juror questionnaires. <u>Id.</u> ("The Prosecutor is willing to look at the race issue and make sure that we're not bringing in prospective jurors that may have racist views."). Given those reasons, which we find persuasive, together with the "great deference" owed to the Trial Court's findings under such circumstances, see, <u>United States v. Bolden</u>, supra at *2,  Dobbins has failed to show that the State Courts unreasonably applied Supreme Court precedent when they decided that No. 181 was struck for a legitimate, nondiscriminatory reason.

Dobbins also claims that the Minnesota Supreme Court did not fully analyze the questioning of minority, and nonminority venirepersons, in order to see whether there was a pattern of discrimination prohibited by <u>Miller-El v. Dretke</u>, supra.  See, <u>Reply</u>, supra at 5.  In his Petition, Dobbins argues that the Minnesota Supreme Court was required to look beyond the case at hand, in order to see whether the State treated minority and nonminority venirepersons differently. <u>Id.</u> at 5-6. Dobbins contends that

the Court simply concluded that he had failed to show discrimination without taking a hard look at the State's treatment of white venirepersons.  Id. at 6.

Although the Trial Court did not cite to specific examples of the treatment of different venirepersons, Dobbins has failed, in his submissions to this Court, and even in his brief to the Minnesota Supreme Court, to point out examples of alleged discriminatory treatment.  See, Memorandum in Support, supra at 6; Reply, supra at 5-6; Answer, supra Exhibit 7, at 15-23.  Even if Dobbins had found examples of alleged discriminatory questioning, our Court of Appeals has determined that it is not the closeness of the comparability between the questioning of the excluded minority venireperson, and that of a white venireperson, but the totality of the relevant facts as to the State's conduct during the Defendant's Trial.  See, Nicklasson v. Roper, 491 F.3d 830, 842 (8th Cir. 2007) cert. denied 128 S.Ct. 2052 (2008).

In sum, Dobbins has failed to demonstrate a pattern of discrimination similar to that reflected in Miller -El v. Dretke, supra at 240-41.  There, out of a venire panel of one hundred and eight (108) persons, twenty (20) were African American, of which nine (9) were removed for cause, and ten (10) were peremptorily struck.  Id. While evidence of different treatment, by the State, between similarly situated minority and nonminority venirepersons, is evidence of purposeful discrimination, it is not enough

to satisfy Dobbins' burden, and Dobbins' failure to present any evidence of discriminatory peremptory challenges, by the State, does not permit us to conduct the inquiry he demands. Id. As a consequence, the Court's determination, that there was no pattern of discriminatory peremptory challenges, cannot be construed as an unreasonable application of Federal law. Therefore, we have no basis to recommend Habeas relief on this ground.

2.    The Right of Confrontation.

a.    Standard of Review. In Newton v. Kemna, 354 F.3d 776, 780 (8th Cir. 2004), cert. denied, --- U.S. ---, 125 S.Ct. 485 (2004), quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965), the Supreme Court stated that "[a] primary interest secured by [the confrontation clause] is the right of cross-examination." "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Walter, 461 F.3d 1005, 1009 (8th Cir. 2006), quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985). "To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving

scant weight to the witness' testimony." Id. at 1010, quoting Delaware v. Fensterer, supra at 22.

Uncovering a witness' motive in testifying has been recognized as an important function of cross-examination.  See, United States v. Purkey, 428 F.3d 738, 753 (8th Cir. 2005), quoting Davis v. Alaska, 415 U.S. 308, 316-17 (1974).  However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also, Wise v. Bowersox, 136 F.3d 1197, 1205 (8th Cir. 1998), cert. denied, 525 U.S. 1026 (1998)(also recognizing that the Sixth Amendment's Confrontation Clause does not strip away a Trial Court's discretion regarding the proper scope of cross-examination). "The  ability of the defendant to achieve through other means the effect that the excluded examination allegedly would have produced is a factor indicating that his right to confrontation was not violated." United States v. Drapeau, 414 F.3d 869, 875 (8th Cir. 2005) cert. denied, 546 U.S. 1119 (2006).

Our Court of Appeals has approved the use of harmless error analysis, in

assessing Confrontation Clause claims, as follows:

> [T]he constitutionally improper denial of a defendant's
> opportunity to impeach a witness for bias, like other
> Confrontation Clause errors, is subject to * * *
> harmless-error analysis." * * * "The correct inquiry is
> whether, assuming that the damaging potential of the
> cross-examination were fully realized, a reviewing court
> might nonetheless say that the error was harmless beyond
> a reasonable doubt." * * *  To make this determination,
> courts should assess factors such as, "the importance of the
> witness' testimony in the prosecution's case, whether the
> testimony was cumulative, the presence or absence of
> evidence corroborating or contradicting" the witness'
> testimony, and "the overall strength of the prosecution's
> case."

Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997), quoting Delaware v. Van Arsdall,
supra at 684; see also, Pruett v. Norris, 153 F.3d 579, 589 (8th Cir. 1998)("Assuming,
without deciding, that [a witness's] testimony violated [the defendant's] right of
confrontation, we proceed to the issue of whether that error was harmless").

With this as our guide, we proceed to Dobbins' Confrontation Clause claim.

      b.    <u>Legal Analysis</u>.  Dobbins claims that he was denied his Sixth

Amendment Right of Confrontation because he was not allowed to cross-exam King

about how many months his sentence could be reduced for testifying against Dobbins.

See, Memorandum in Support, supra at 8.  Dobbins was allowed, however, to question

King on the approximate percentage that his sentence would be reduced.  Id. at 8.

Dobbins asserts that he was denied his Right of Confrontation because he was not

allowed to explore King's potential bias.  Id. at 8-10.

Here, the Trial Court was concerned that the Jurors would attempt to calculate

the sentence for King, which could prompt them to try to compute what the potential

sentence would be for Dobbins.  See, Answer, supra Exhibit 2 at 541-42.  In

determining that Dobbins would be allowed to question King, in terms of the potential

percentage of sentence, which could be reduced because of Kings' cooperation, the

Court relied on State v. Greenleaf, 591 N.W.2d 488 (Minn. 1999). There, the

Defendant was also challenging the Court's decision to limit his cross-examination

as to the percentage that a cooperating witness' sentence would be reduced, rather

than to allow inquiry as to the number of months of reduction.  See, State v.

Greenleaf, supra at 502.

The Court noted that the Confrontation Clause only guarantees an opportunity

for effective cross-examination, and not cross-examination that is effective to the full

extent of the defense's desire.  Id., citing Kentucky v. Stincer, 482 U.S. 730, 739

(1987).  As was the case here, in Greenleaf, the Court was fearful that "a recitation of

the number of months of confinement [that the cooperating witness] could serve might

mislead the jury regarding the number of months another defendant, if convicted, might be confined." Id. The Minnesota Supreme Court found that it was acceptable to limit the cross-examination to percentages, since it prevented the Jury from speculating on the length of the Defendant's potential sentence. Id.

The Court's reliance on State v. Greenleaf was not unreasonable as our Court of Appeals has found that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Wise v. Bowersox, supra at 1205 quoting Delaware v. Van Arsdal, supra at 679. The Trial Court's concern falls within its wide latitude of discretion, as granted under Federal law, and therefore, does not constitute an unreasonable application of that law.

Even assuming that Dobbins had been allowed to cross-exam King about his sentence reduction in terms of months, we are not persuaded that the end result -- namely, Dobbins' conviction -- would have been any different. King's testimony described what occurred before and after Lavender's murder. See, State v. Dobbins, supra at 498-99. Portions of King's testimony were corroborated by the testimony of

Dobbins' girlfriend, and her sisters, Shiniqua and Thaijuana. Id. at 499-500. Forensic

evidence, such as the presence of Lavender's DNA on Dobbins' pants, shoes, and

socks, as well as the gunshot residue on Dobbins' hands and clothing, also

corroborated King's testimony. Id. at 497. In sum, the overall strength of the State's

evidentiary case satisfies the harmless error analysis -- namely, even if the number of

months of reduction in King's sentence, owing to his cooperation with the

prosecution, had been brought to the Jury's attention, rather than the percentage

reduction, the other evidence would have remained powerfully convincing as to

Dobbins' guilt. Given the totality of the evidence of Dobbins' guilt, King's alleged

bias would not have been appreciably undermined, given the fact that the Jury was

allowed to weigh any bias on the basis of the percentage of sentence reduction, as

opposed to the actual months of sentence reduction. Therefore, even if the cross-

examination limitation of the Trial Court was error, the error was legally harmless.

### 3.  The Prosecutorial Misconduct Claim.

a.  Standard of Review. Dobbins challenges certain conduct

of the  prosecution, which he regards as misconduct, inclusive of that which was

objected-to, and that which was not. See, Memorandum in Support, supra at 6. If a

timely objection to an error is made, then Rule 52(a), Federal Rule of Criminal

Procedure, applies and the error is analyzed under the harmless beyond a reasonable doubt standard.  See, <u>United States v. Triplett</u>, 195 F.3d 990, 996 (8th Cir. 1997), cert. denied, 529 U.S. 1094 (2000), citing <u>Chapman v. California</u>, 386 U.S. 18, 22-24, 87 (1967); see also, <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993).  The burden rests with the State to prove that the error was harmless beyond a reasonable doubt.  See, <u>United States v. Triplett</u>, supra at 996.

Unobjected-to prosecutorial misconduct is reviewed for plain error.[7]  See, <u>Rule 52(b), Federal Rules of Criminal Procedure</u>; <u>United States v. Two Elk</u>, 536 F.3d 890, 900 (8th Cir. 2008), citing <u>United States v. Sharpfish</u>, 408 F.3d 507, 511 (8th Cir. 2005).  However, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights," and "[i]f all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness,

---

[7] "Appellate review under the plain-error doctrine, of course, is circumscribed and we exercise our power under Rule 52(b) sparingly."  <u>United States v. Pirani</u>, 406 F.3d 543, 550 (8th Cir. 2005) quoting <u>Jones v. United States</u>, 527 U.S. 373, 389 (1999).

integrity, or public reputation of judicial proceedings." United States v. Pirani, supra

at  550, quoting Johnson v. United States, supra at 466-67 (1997).

The word "error" is to be read as error -- that is, a "[d]eviation from a legal rule

is 'error' unless the rule has been waived." United States v. Olano, supra at 732-33.

"Plain" is defined as "clear or obvious." Id. at 734. "For an error to have been plain,

it must have been "clear" or "obvious" under current law." United States v.

Lachowski, 405 F.3d 696, 698 (8th Cir. 2005), citing United States v. Olano, supra at

734.  In order to "affect substantial rights," "the error must have been prejudicial:  It

must have affected the outcome of the district court proceedings." United States v.

Olano, supra at 734.  The defendant bears the burden of proving plain error.  See,

United States v. Pirani, supra at 550, citing United States v. Olano, supra at 734-35.

We will reverse a conviction for prosecutorial misconduct only if "(1) the

prosecutor's remarks or conduct were improper, and (2) the remarks or conduct

prejudicially affected the defendant's substantial rights so as to deprive him a fair

trial." United States v. Ziesman, 409 F.3d 941, 953 (8th Cir. 2005), cert. denied, ---

U.S. ---, 126 S. Ct. 579 (2005), quoting United States v. Beckman, 222 F.3d 512, 526

(8th Cir. 2000).  "If we reach the second step, we consider '(1) the cumulative effect

of the misconduct, (2) the strength of the properly admitted evidence of the

defendant's guilt, and (3) any curative actions taken by the trial court.'" <u>United States v. Londondio</u>, 420 F.3d 777, 787 (8th Cir. 2005),quoting <u>United States v. Ziesman</u>, supra at 953, quoting, in turn, <u>United States v. Beckman</u>, supra at 526.

As a result, a Habeas petitioner "bears the heavy burden of showing that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." <u>Mack v. Casper</u>, 92 F.3d 637, 643 (8th Cir. 1996), cert. denied, 520 U.S. 1109 (1997), citing <u>Jones v. Jones</u>, 938 F.2d 838, 844-45 (8th Cir. 1991); see also, <u>Moore v. Wyrick</u>, 760 F.2d 884, 886 (8th Cir. 1985); <u>Roberts v. Bowersox</u>, 137 F.3d 1062, 1066 (8th Cir. 1998)(prosecutorial misconduct does not merit Habeas Corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's Due Process right to a fair Trial), cert. denied, 525 U.S. 1073 (1999), citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).

b.    <u>Legal Analysis</u>.

1.    <u>The Objected-To Misconduct</u>.  Dobbins claims that the State committed misconduct when the prosecutor asked Dobbins questions that were designed to emphasize the fact that Dobbins' presence throughout the Trial enabled him to tailor his testimony.  The Minnesota Supreme Court determined that,

- 40 -

under State law, that cross-examination was prosecutorial misconduct.  See, <u>State v. Dobbins</u>, supra at 508.

However,  it is well-settled that Federal Habeas Corpus relief is available to State prisoners only for Federal constitutional violations.  See, <u>Title 28 U.S.C. §2254(a)</u>; see also, <u>Estelle v. McGuire</u>, supra at 67 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Under Federal law, it is not prosecutorial misconduct to comment that the Defendant's presence throughout the Trial affords him the  ability to tailor his testimony to the facts adduced.  See,  <u>Portuondo v. Agard</u>, 529 U.S. 61 (2000); <u>Colbert v. Minnesota</u>, 2007 WL 4240738 * 12 (D. Minn., August 16, 2007), adopted, 2007 WL 4224214 at *4 (D. Minn., November 28, 2007).  Since Dobbins' claim has no merit under the United State Constitution, as recognized by the Supreme Court in  <u>Portuondo</u>, the claim must be denied as a basis for Habeas relief.

2.      <u>Unobjected-To Prosecutorial Misconduct</u>.

1.      <u>The Right to Remain Silent and to have Legal</u>

<u>Counsel</u>.  Dobbins claims that the State improperly cross-examined him concerning

his constitutional right to remain silent, and to be represented by legal counsel.  For

that claim, Dobbins relies upon the following exchange:

> Q:      [The police detective] was asking you questions?
>
> A:      Yeah. He tried to ask me questions, but I said I [would] just take a lawyer.  I still want a lawyer. Talk to a lawyer.
>
> Q:      And before that, you never told [him] anything about that you saw Myshohn King shoot anybody?
>
> A:      I was-That's what I was [going to] tell [him].
>
> Q:      That's-Answer my question.
>
> A:      Yeah.
>
> Q:      You didn't tell him?
>
> A:      I didn't tell [him] anything.

> Q:      Anything about Myshohn King shooting anybody; did you?
>
> A:      I didn't tell [him] anything.
>
> Q:      You didn't tell him at the time as it happened you were in your back bedroom ironing your new Globetrotters outfit; did you?
>
> A:      I didn't tell [him] anything.
>
> Q:      And he was asking you at that time?
>
> A:      He asked me if I still wanted a lawyer, and I told [him], you know, then again I think I might be comfortable with a lawyer present, so that's how that conversation ended, and all the conversation with the police was [nothing] but a few seconds.  It wasn't a long conversation. Once he told me I had a right to have a lawyer there, that's what I requested.

State v. Dobbins, supra at 509.

After Dobbins' last response, the Trial Court asked the parties to approach the Bench and, after a short discussion, the questioning changed to a different topic.  Id.

On review, the Minnesota Supreme Court acknowledged that it did not permit questions concerning a defendant's exercise of his or her constitutional right to remain silent, and to be represented by legal counsel.  Id., citing State v. Penkaty, 708 N.W.2d

- 43 -

185, 199 (Minn. 2006).  However, the Court noted that the Constitution "does not bar the use of postarrest silence to impeach the Defendant's credibility where no <u>Miranda</u> warning was given." <u>Id.</u> at 510 citing <u>State v. Morrison</u>, 351 N.W.2d 359, 361 (Minn. 1984), and <u>Fletcher v. Wier</u>, 455 U.S. 603 (1982).  The exception was inapplicable to Dobbins' case, however, as Dobbins was afforded two (2) <u>Miranda</u> warnings, and the State's line of questioning focused upon Dobbins' post-<u>Miranda</u> silence.  <u>Id.</u>  As the Minnesota Supreme Court recognized, the United States Supreme Court has held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving <u>Miranda</u> warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."  <u>Id.</u> quoting <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976).  Moreover, the Minnesota Supreme Court acknowledged that it had adopted <u>Doyle's</u> holding in <u>State v. Billups</u>, 264 N.W.2d 137, 139 (Minn. 1978).

Based upon those authorities, the Minnesota Supreme Court found that the quoted line of questioning constituted prosecutorial misconduct.  See, <u>State v. Dobbins</u>, supra at 510.  While finding that the State had committed plain error, the Minnesota Supreme Court concluded that the State had carried its burden of showing that the error was not prejudicial.  <u>Id.</u> at 513.  Given the Record presented, we are unable to conclude that the Minnesota Supreme Court unreasonably applied Federal

- 44 -

law when it found that there was prosecutorial misconduct, but that the conduct was not prejudicial.

As explained by the Minnesota Supreme Court, the use of a defendant's silence at the time of arrest, or after a <u>Miranda</u> warning, violates that defendant's right to Due Process, see, <u>United States v. One Star</u>, 465 F.3d 828, 832 (8th Cir. 2006), citing <u>Doyle v. Ohio</u>, supra at 619, and constitutes plain error.  See, <u>United States v. Lachowski</u>, supra at 698 ("Usually, for an error to be plain, it must be in contravention of either Supreme Court or controlling circuit precedent.").  Federal law places the burden of persuasion on the defendant to prove that any error was prejudicial.  See, <u>United States v. Pirani</u>, supra at 550, citing <u>United States v. Olano</u>, supra at 734-35.  The Minnesota Supreme Court has recently placed that burden on the State.  See, <u>State v. Ramey</u>, 721 N.W.2d 294, 302 (Minn. 2006).  However, as we have explained, it remains well-settled that Federal Habeas Corpus relief is available to State prisoners only for Federal constitutional violations.  See, <u>Title 28 U.S.C. §2254(a)</u>; see also, <u>Estelle v. McGuire</u>, supra at 67.  Thus, the burden remains on Dobbins to prove that an error was prejudicial.

Even with the employment of the different, Federal standard, our outcome does not differ from that reached by the Minnesota Supreme Court.  Dobbins has failed to

proffer any evidence that the State's line of questioning denied him a fair Trial. The

Trial Court took curative measures by stopping the State's questioning after only

seven (7) questions.  See, e.g., <u>Clark v. Wood</u>, 823 F.2d 1241, 1247 (8th Cir. 1987)

(finding that brief questioning about what the Defendant told a Public Defender did

not lead to his conviction).  Furthermore, the overall strength of the State's case, with

both weighty testimonial and scientific evidence, overwhelmingly established that

Dobbins shot Lavender.  Such evidence cannot be outweighed by limited questioning

surrounding Dobbins constitutional right to remain silent, and his right to counsel.

Since Dobbins has failed to prove that the error was prejudicial, we conclude that the

error was harmless.

2.      <u>Are They Lying? Questions</u>.  Dobbins next

challenges the Minnesota Supreme Court's determination that the State's "Are they

lying?" questions were non-prejudicial. Dobbins' challenge comes from the following

exchange:

Q:     It's your position, Mr. Dobbins, that you've been
        falsely accused of this crime?

A:     Exactly.

Q:     Falsely accused by Myshohn King-

- 46 -

A:     Exactly

Q:     -Who was your friend?

A:     And mainly you.

Q:     Falsely accused by Andre Coleman?

A:     No.

Q:     He's your cousin?

A:     (Shakes head.)

Q:     Falsely accused by Thaijuana [last name]?

A:     (Shakes head.)

Q:     Falsely accused by Shiniqua [last name]?

A:     (Shakes head.)  They said what they thought I said which that wasn't true.

Q:     Falsely accused by statements of Derrick [last name]?

A:     What he say that was incriminatin' to me?

Q:     And falsely accused by your girlfriend [name]?

A:     Yeah. It can't happen?

State v. Dobbins, supra at 511.

The Minnesota Supreme Court acknowledged that it generally does not approve of "Are they lying?" questions.  Id. citing State v. Morton, 701 N.W.2d 225, 233 (Minn. 2005).  However, the Court does allow those types of questions when the defendant calls the credibility of the State's witnesses into question.  Id., citing State v. Morton, supra at 233.

The Minnesota Supreme Court determined that Dobbins had drawn King's credibility into central focus, because Dobbins testified that it was King, and not himself, who had shot Lavender.  Id.  The Minnesota Supreme Court concluded that the State did not commit misconduct when it asked Dobbins if King was lying.  Id.  However, it was prosecutorial misconduct when the State asked "Are they lying?" questions as to Dobbins' girlfriend, and her sisters, Thaijuana, and Shiniqua.  Id.  Although Dobbins disputed their testimony, he did not testify that they were falsifying their testimony, and therefore, the State's questions were not justified.  Id.  The Court also determined that the State had committed plain error as to those questions,  but found that State had carried its burden by demonstrating that those questions were not prejudicial.  Id. at 513.

We agree with the Minnesota Supreme Court, that the State committed plain error but that the questions were not prejudicial.  As noted, Minnesota and Federal law

differ on who bears the burden of persuasion in determining whether the error was prejudicial. The difference, however, does not change the outcome. Our Court of Appeals also does not condone "Are they lying?" type questions. See, Lamar v. Graves, 326 F.3d 983, 987 (8th Cir.) cert. denied, 540 U.S. 1080 (2003). Other Circuits have also determined that such questions are inappropriate. See, United States v. Harris, 471 F.3d 507, 511 (3rd Cir. 2006); United States v. Thomas, 453 F.3d 838, 846 (7th Cir. 2006); United States v. Williams, 343 F.3d 423, 438 (5th Cir. 2003); United States v. Sullivan, 85 F.3d 743, 749 (1st Cir. 1996); United States v. Boyd, 54 F.3d 868, 871 (D.C. Cir. 1995); United State v. Richter, 826 F.2d 206, 208 (2nd Cir. 1987).

Although those cases found that such questions constitute error, the Courts did not find the questions to be prejudicial. See, United States v. Thomas, supra at 846 (concluding that the questions did not affect the Jury's Verdict); United States v. Williams, supra at 438 (determining that the questions were inappropriate but did not constitute reversible error); United States v. Sullivan, supra at 750 (finding the questions to be harmless); United States v. Boyd, supra at 871 (finding that the defendant "suffered no prejudice from the prosecutor's improper questions").

We further agree that the State's questions amounted to plain error, but we find that Dobbins has failed to show that they were prejudicial.  The strength of the State's evidence, as well as the limited nature of the questions, did not fatally infect the proceedings such that Dobbins was denied his right to a fair Trial.  Therefore, the error was harmless.

3.	Other Prosecutorial Misconduct.  Dobbins claims that the Jury's attention was diverted from issues of guilt and innocent, by other questions and statements made by the State.  Dobbins cites three (3) different instances of prosecutorial misconduct, and we consider each in turn.

Dobbins' first claim is based upon the State's questions concerning his faithfulness to his girlfriend, and whether Dobbins knew if he was the father of her child.  The Minnesota Supreme Court has held that asking questions, or making arguments, which divert the Jury's attention to issues beyond guilt or innocence, is inappropriate.  See, State v. Dobbins, supra at 512.  The Court determined that the State's questions about Dobbins' relationship with his girlfriend were not relevant to Dobbins' guilt or innocence, and impermissibly questioned Dobbins' character.  Id.

Dobbins also challenges the State's "your world" comments, during Dobbins'

cross-examination.  Specifically, Dobbins refers to the following line of questioning:

Q:     In the world you live in, Mr. Dobbins, people
       shouldn't tell about things they saw; correct?

A:     What world? I live in the same world you live in.

Q:     And people shouldn't tell, in your world, even if it's
       the truth?

A:     I live in the same world you live in.

Q:     And it takes courage to tell the truth about what you
       see?

> A:    Like I say, I [do not have anything] to do with all
>       that.

State v. Dobbins, supra 512.

The Minnesota Supreme Court found that the line of questioning was improper, because the State made no effort to clarify what exactly it meant by the "your world" comments. Id. The Minnesota Supreme Court feared that those comments might have improperly referred to Dobbins' racial or socioeconomic status, which the Court had previously found to be improper. Id., citing State v. Ray, 659 N.W.2d 736, 746-47 (Minn. 2003). As a result, the Court determined that the comments constituted plain error, but nonetheless, were not prejudicial since the State had satisfied its burden to show that the comments did not affect the Jury's Verdict.

Our Court of Appeals has also held that cross-examination, which was similar to that posed by the State, was improper. See, United States v. Lowrimore, 923 F.2d 590, 593 (8th Cir. 1991)(determining that incorrectly stating the number of times the prosecutor had seen the defendant testify, and sharing the prosecutor's belief that the defendant had shown no remorse over his wife's death, was improper). In the case of closing arguments, "it is well established that appeals to the passion, prejudice, or sympathy of jurors during closing argument are improper, and may be grounds for

reversal." <u>United States v. Eagle</u>, 515 F.3d 794, 805 (8th Cir. 2008) citing <u>Viereck v.</u>

<u>United States</u>, 318 U.S. 236, 247 (1943).  An emotional appeal, that is calculated to

persuade the Jury to decide the case on something other than the evidence of Record,

is improper.  <u>Id.</u>, citing <u>United States v. Lee</u>, 743 F.2d 1240, 1253 (8th Cir. 1984).  Nor

may a prosecutor comment on the veracity of the defendant.  See, <u>United States v.</u>

<u>White</u>, 241 U.S. 1015, 1023 (8th Cir. 2001), citing <u>United States v. Shoff</u>, 151 F.3d

889, 893 (8th Cir. 1998).

Dobbins' final claim is that the State committed misconduct when the

prosecutor, in his closing statement, stated:  "I would know the difference and I would

be honest when I testify," and "[d]esperation and self-preservation can lead to some

pretty fanciful tales."  <u>Id.</u>  On review, the Minnesota Supreme Court conceded that the

statements were improper, and noted that it had previously held that "the State cannot

exploit the influence of its office by injecting personal opinions, into a case.  <u>Id.</u>,

citing <u>State v. Everett</u>, 472 N.W.2d 864, 870 (Minn. 1991).

We concur with the Minnesota Supreme Court that the State's conduct was

plainly improper.  The Jury did not need to know if Dobbins was faithful to his

girlfriend, or if he was the father of her child, nor could the Jury know what the

prosecutor would have done in Dobbins' situation.  The unqualified " your world"

- 53 -

comments raise the possibility that the State was referring to Dobbins' race or economic status, rather than Dobbins' chosen profession.  Such questions and comments were well beyond the evidence the Jury needed in order to determine guilt or innocence, and they should not have been raised by the State.

Although we conclude that the State's conduct was plain error, that conduct did not deprive Dobbins of a fair Trial.  As noted, the burden was on Dobbins to demonstrate that the comments and questions were so prejudicial that they denied him his constitutional right to a fair Trial, and Dobbins has failed to carry that burden. Furthermore, the State's overwhelming showing of Dobbins' guilt, through both testimonial and forensic evidence, demonstrated, beyond a reasonable doubt, that Dobbins shot Lavender, and was guilty of the offense of which he was charged.  As a result, the State's questions and comments constituted no more than harmless error.

3.    The Cumulative Effect of the State's Misconduct. Dobbins claims that, even if the State's misconduct was not prejudicial when considered individually, the cumulative effect of the misconduct denied him a fair Trial.  The Minnesota Supreme Court found that State had satisfied its burden to prove that the unobjected-to misconduct, when considered cumulatively, was not prejudicial.  As noted, the Federal standard places the burden of persuasion on the defendant to prove

that the misconduct was prejudicial. When we weigh the cumulative effect of the prosecutorial misconduct against the strength of the State's evidence, we find that the misconduct was not prejudicial.

As we have noted, the State had King as an eyewitness to the murder, and King's testimony was corroborated by the testimony of Dobbins' girlfriend, as well as by Shiniqua, and Thaijuana.  See, <u>State v. Dobbins</u>, at 499-500.  Further, the State's forensic evidence, inclusive of Lavender's DNA on Dobbins' pants, shoes, and socks, as well as the gunshot residue on Dobbins' hands, and clothing, only strengthened the State's testimonial evidence.   <u>Id.</u> at 497.   Overall, the State's evidence overwhelmingly demonstrated that Dobbins murdered Lavender.  Therefore, as did the Minnesota Supreme Court, we find that the cumulative effect of the prosecutorial misconduct was harmless.

In sum, finding no responsible basis upon which to grant the Petitioner's request for Habeas relief, we recommend that his Petition be dismissed with prejudice.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Petition for a Writ of Habeas Corpus [Docket No. 1] be DENIED.


Dated:  November 5, 2008                    *s/Raymond L. Erickson*
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE


NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than**

**November 24, 2008,** a writing which specifically identifies those portions of the

Report to which objections are made and the bases of those objections.  Failure to

comply with this procedure shall operate as a forfeiture of the objecting party's right

to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing **by no later than November 24, 2008,** unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.